(No. 11003.—Judgment affirmed.)

THE CITY OF CHICAGO, Appellee, *vs.* JAMES F. LORD *et al.*— (CATHERINE M. SHANNON, Appellant.)

*Opinion filed June 21, 1917—Rehearing denied October 5, 1917.*

1. EMINENT DOMAIN—*when finding of the jury as to values of property will not be disturbed.* Where the findings of the court or a jury are within the range of values testified to by the witnesses and do not appear to have been the result of prejudice, passion, undue influence or other improper cause, the amount of the judgment will not be disturbed.

2. SAME—*where a jury is waived the judge may view the premises.* Where a jury is waived it is proper for the trial judge to consider all testimony that the jury could properly consider, and to view the premises, and to avail himself of the knowledge so gained in making his findings and rendering judgment.

3. SAME—*when party cannot complain that judge did not write in the record his impressions from a view of the premises.* A party has no cause of complaint that the trial judge did not write his impressions, gained by his view of the premises, into the record, where no such request was made after the judge viewed the premises nor at the time the bill of exceptions was being made up and signed.

4. SAME—*time of paying award of damages need not be fixed in judgment under Local Improvement act.* In a proceeding under the Local Improvement act for the widening of a street, where some property is condemned and some assessed for benefits, it is not necessary that the court in its judgment fix a time for the payment of the award of damages, as required by the Eminent Domain act.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

EDWARD J. KELLEY, for appellant.

SAMUEL A. ETTELSON, Corporation Counsel, HARRY ATWOOD, EUGENE H. DUPEE, and TOLMAN, REDFIELD & SEXTON, (ROBERT REDFIELD, and HENRY P. CHANDLER, of counsel,) for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On April 7, 1911, the city of Chicago, appellee, filed a petition in the superior court of Cook county setting forth that on April 5, 1911, the city council of said city passed an ordinance providing that East and West Twelfth street be widened and improved from South Michigan avenue to South Ashland avenue, in said city. The petition described the lots, blocks and parcels of land along said street which will be taken or damaged for said improvement, and to it was attached a copy of the ordinance. Appellee prayed that proper steps might be taken to ascertain the just compensation to be made for private property to be taken or damaged for such improvement and to ascertain what property will be benefited by the improvement and the amount thereof. On November 27, 1914, the commissioners' report and assessment roll were filed, and the commissioners made the following award of damages and assessments with reference to the two lots owned by Catherine M. Shannon, appellant, and affected by said improvement: Damages for lands taken off of lot 12, $3500; damages to improvements on lot 12, $2000; damages for lands taken off of lot 13, $100; damages to improvements on lot 13, $1000. The assessment for special benefits to lot 12 was $6000 and for special benefits to lot 13 $2500. A cross-petition was filed by appellant, alleging that the compensation allowed to her by the commissioners for lands taken is grossly inadequate, and that the remainder of her lots not taken will not be benefited by the proposed improvement but will be damaged, and praying for a hearing and proper relief. A jury was

waived and appellant's evidence was heard by the court on December 13, 1915, and the cause continued. On May 3, 1916, appellee's evidence was heard, and the court, on request of the appellee, viewed the premises. Argument was waived, and the court entered judgment for $2250 damages for improvements taken and damaged on lot 12, and confirmed the award of the commissioners for damages to lands taken from lots 12 and 13 and for improvements taken and damaged on lot 13 and confirmed the assessments spread upon both of said lots.

West Twelfth street, on April 7, 1911, in the vicinity of appellant's said property, was 66 feet wide, and the Chicago Railways Company had a double-track street car line running thereon. It was a very much-traveled thoroughfare, and travel thereon was very difficult, owing to the very great amount of freight and other commodities that were then thereon being transported by wagons, motor trucks and other vehicles. The proposed improvement will widen West Twelfth street between a line 120 feet west of the west line of South Canal street and the east line of South Ashland avenue to the width of 108 feet. The ordinances provide that the roadway between those points shall be 78 feet in width and be improved by the construction of a granite concrete curb and a pavement of granite blocks on a layer of sand and a foundation of Portland cement concrete, with suitable means of drainage. Concrete sidewalks of vault construction 15 feet wide, and a concrete curb wall, are to be constructed between the curb lines and the street lines, and the whole improvement is to be paid by a special assessment in five installments. The street car tracks will be re-constructed in the center of the roadway without cost to the city.

The east end of Twelfth street, beginning 120 feet west of the west line of South Canal street and extending to a line 120 feet east of the east line of Wabash avenue, is to be improved by a new viaduct 118 feet wide, in two sec-

tions, divided by the river. The viaduct will have two side-walks 17 feet in width, of the same construction as the sidewalks west of Canal street. The roadway will be 84 feet wide, with an island six inches higher than the roadway surface and 25 feet in width, upon which the double-track street railway will be operated, leaving the roadway on each side thereof 29½ feet wide, upon which traffic will move in one direction, only. There will be no obstruction on the upper surface of this viaduct, except at a point midway between State street and Wabash avenue, where the South Side Elevated railroad passes over the structure. At that point the elevated structure will be supported by a series of columns in the center of the street and on the curb lines. The viaduct will be lighted by constructing a combination of trolley and light poles placed about 100 feet centers longitudinally in the center between the street car tracks. Wabash avenue will be raised about 3½ feet above its present level, and approaches to the viaduct will be constructed with three per cent grades from Wabash avenue and extending north and south of Twelfth street for a distance of 130 feet. There will be approaches on the east side of Clark street both to the north and south. Stairways will be provided to reach this viaduct at different points, two being placed on the east side of State street and one, each, at the southeast and northwest corners of Clark and Twelfth streets. After a high level is reached just west of State street that level will continue to within a short distance of South Canal street, where the westerly approach will descend at a three per cent grade. The viaduct will be drained by putting crowns in the roadway and providing catch-basins, man-holes and sewer connections. The pavement on the four approaches will be of No. 1 dressed granite blocks, and on the structure itself, of creosoted wood-block paving. The frame of the structure will be built of structural steel shapes covered with

concrete to an average thickness of about three inches, thus protecting it against engine gases and smoke and creating a neat and good appearance. Where there is no occupation adjoining the viaduct on the building line a solid concrete railing will be erected to protect pedestrians and vehicle traffic. The two sections of the viaduct will be connected at the Chicago river by a modern bridge of the vertical lift type, at a cost of $650,000, one-half of which is to be paid by the Sanitary District of Chicago. It will be 90 feet in width, with a clear sidewalk on each side 13½ feet wide, and the railway right of way will be an island 23 feet wide, with a roadway on each side and paved with creosoted wooden blocks. The bridge will be modern throughout, and while it is being raised, barriers will be placed over the sidewalk and roadway area so as to protect vehicles and pedestrians. The present Fifth avenue viaduct approaching Twelfth street from the north will be properly connected with the new viaduct.

The present viaduct in Twelfth street extends from Wabash avenue to Canal street and is of various types. The structure is, in general, 58 feet in width, having two roadway spaces of 17 feet, and the sidewalk on each side is about seven feet wide, with the street railway tracks taking up the remainder of the space. The upper surface rises and falls between Wabash avenue and Canal street many times. Its physical condition is very poor and for the last fifteen years it has required repairing a number of times. It affords very poor facilities for pedestrians and for street car and vehicle traffic, and there are many obstructions in the roadways, due to the projection above the surface of the girders, trusses and steel guards. The present bridge over Chicago river at Twelfth street is of the center-pier swing type. Its original width was 59 feet, but in its present condition the south sidewalk has been entirely ripped off. It now has two roadways, each of 17 feet, and one

sidewalk on the north, of five feet. The street railways occupy the remaining part of it.

Blue Island avenue runs in a northeasterly and southwesterly course from Harrison street to Twenty-second street and crosses West Twelfth street between South Canal street and South Ashland avenue and is 80 feet wide where it crosses that street. It crosses West Twelfth street, an east and west street, at a sharp angle 28.11 feet northeast of the north corner of appellant's lot 12, known as 1205 Blue Island avenue. Lots 12 and 13 are on the southeast side of Blue Island avenue, having each 24.11 feet frontage on that street, and extend back from that street southeasterly 100 feet, lot 13 being southwest of and adjoining lot 12 and known as 1207 Blue Island avenue. Lot 11 is of the same dimensions as lot 12 and adjoins it on the northeast and has the same frontage on Blue Island avenue. The north corner of lot 11 is about four feet south of Twelfth street as that street was located April 7, 1911. Lot 10 lies northeast of and adjoins lot 11 and is in the form of a trapezoid, the north side of which is the south line of old Twelfth street. The southwest line of lot 10 crosses the southeast line of Blue Island avenue about four feet south of the south line of Twelfth street, giving the lot four feet frontage on Blue Island avenue. The fourth side of lot 10 is a north and south line. Lots 12 and 13, therefore, prior to the inauguration of the proposed improvement, had no frontage except on Blue Island avenue.

It is proposed by the new improvement to locate the south line of Twelfth street 42 feet further south and to take the 42-foot strip between the old and the new line, thereby increasing the present width of Twelfth street from 66 feet to 108 feet. This new line of Twelfth street will cut off of the north corner of lot 13 a triangular piece of land of the dimensions of 4.14 feet on the south side formed by the new Twelfth street line, 2.3 feet on the southeast line of Blue Island avenue, and 3.32 feet on the northeast

side of the triangle, on the line between lots 12 and 13, and containing 4.82 square feet. This will give lot 13 a new frontage of 4.14 feet on the new improved Twelfth street and 21.81 feet frontage on Blue Island avenue, and cut the same-shaped triangle off of the north corner of the three-story brick building of appellant on that lot. The new south line of Twelfth street will also cut a piece of land off the northwest end of lot 12, which will be in the form of a trapezium, of the dimensions of 47.53 feet on the side formed by the new Twelfth street line, 3.32 feet on the southwest side, 24.11 feet on the southeast line of Blue Island avenue, and 39.51 feet on the northeast side of the land taken, and containing 516.32 square feet. The proposed improvement will leave the remainder of lot 12 in a triangular shape on the northwest end, with a frontage on the new Twelfth street line of 47.53 feet, and the lot will have no frontage on Blue Island avenue. All of the northwest end of the appellant's two-story frame building fronting on Blue Island avenue that covers the land taken will be cut off. The part of lot 12 not taken will contain 1894.68 square feet, and be 96.68 feet long on the southwest side and 60.49 feet on the northeast side.

Blue Island avenue and Twelfth street are two of the most populous streets in the city and are two of the best business centers in the city. Blue Island avenue has a double-track street railway, and the corner at Twelfth street and Blue Island avenue is one of the best business centers outside of the loop district. Appellant purchased her two lots in June, 1910, and paid $30,000 for them and the improvements thereon. Lot 12 has a wooden two-story building on it, without any basement. The second floor does not extend back further than about 45 feet and contains an open hall. The lower part of the building extends almost to the rear end of the lot, and the building is about twenty or thirty years old. It was leased on September 5, 1913, at a rental of $75 per month for the first eleven

months, beginning October 1, 1913, and $100 per month for the remaining time, ending August 31, 1917, the lessees to make all repairs except on roof. The building on lot 13 is the same width as the lot and extends back 89 feet and 11 inches and is of the value of about $8000. The front portion of the building is of brick, of three stories and a basement, with a depth of about 39 feet. The rear building is a two-story frame building used as flats, while the front portion is a store on the first floor with flats on each of the two upper floors. The building is about thirty years old, and was leased in March, 1909, for five years, beginning May 1, 1909, and ending April 30, 1914, at a rental of $125 per month for the first two years and $150 per month thereafter. The facts above recited are undisputed.

The three principal grounds urged by appellant on this appeal for the reversal of the judgment of the superior court are, (1) that the parts of her lots that are not taken for the improvement are not benefited to the amount of the assessments confirmed by the court; (2) that the damages allowed her for improvements taken and damaged are insufficient; (3) that the damages awarded her for the lands taken are inadequate.

Four witnesses testified for appellant that the fair cash market value of lot 12 on April 7, 1911, was $1000 per front foot. One of them testified that lot 13 was of the same value, and two others that lot 13 was of the value of $950 per front foot. Three of her witnesses testified that the fair cash market value of the part of lot 12 taken for the improvement was, respectively, $19,200, $17,500 and $15,000. A fourth witness testified that the entire damage to lot 12 by reason of the improvement would be $18,000, but he did not specify what part of the $18,000 was the value of the lot taken and what part thereof should be allowed for damages to the improvements on lot 12. Three of her witnesses valued the part of lot 13 taken for the improvement in amounts varying from $100 to $150. Five

witnesses testified that no lots on Twelfth street would be benefited by the improvement but would be damaged, including appellant's lot 12. They gave as their reason that widening the street would not have any tendency to increase the value of property on that street but would increase the value of the property on the side streets. They also gave as a further reason why the remainder of lot 12 would not be increased by the improvement, that it was left in a very irregular shape, without sufficient depth, and would not be a corner lot. Two of her witnesses testified that the remainder of lot 13 not taken would be benefited $1500 by the improvement, and one that it would be benefited $2000. A fourth witness testified that neither lot would be benefited as it remained after the improvement, when considered singly, but that both, if considered as one property and under one ownership, would be benefited $3000. All the witnesses for both parties are agreed that the improvement will entirely destroy the frame building on the appellant's lot 12, and three of appellant's witnesses gave as the fair cash market value of that building on April 7, 1911, sums ranging from $3400 to $3465.99.

Four witnesses for appellee, as stipulated by the parties, were practically unanimous in their views touching the questions bearing on the said three propositions. Ernest H. Lyons testified, in substance, that the value of the part of lot 12 taken for the improvement was $6 per square foot, or a total of $3097.92, and the value of the part taken from lot 13 was $19.28, on April 7, 1911; that these values are exclusive of improvements, and that the remainder of both lots as now situated was worth at that time $5 per square foot, or $21,500, and will be worth after the improvement is made $10 a square foot, or $43,100; that lot 13 is benefited a great deal more than it is assessed and that lot 12 will also be benefited more than it is assessed; that in making his estimate he considered all proper elements to be considered,—the cost of the lots to appellant,

the use of the property in the neighborhood, the street, the location with reference to the center of the city, the rents paid for the property, the frontage on the improved street, and that one of the lots will be a corner lot and the other near the corner. It was agreed that three other witnesses would testify to the same facts that this witness did. Four other witnesses testified that the sum of $2000 was greatly in excess of the value of the improvements on lot 12, and gave it as their judgment that the fair cash value thereof was from $836.10 to $868.48, being thirty per cent of the estimated cost of the building if new. They also fixed the damages to the building on lot 13 in sums varying from $800 to $1100.

The various values fixed by the judgment of the court are within the range of the evidence and are much more favorable to appellant than the values given by the witnesses for appellee. All of the witnesses who testified on either side were expert witnesses, possessing the knowledge, in detail, of the facts that affect the value of the property and that bear on the question of the benefits by reason of the improvement. The court had all the benefit of the foregoing testimony, saw and heard the witnesses testify, and was in a much better position to understand the issues and to properly settle them than this court can possibly be. It would be very little short of presumption for this court to say that the court erred in its findings. This court has repeatedly held that where the findings of the court or a jury are within the range of values testified to by the witnesses and do not appear to have been the result of prejudice, passion, undue influence or other improper cause, the judgment will not be disturbed. (*South Park Comrs.* v. *Ayer,* 245 Ill. 402.) While the assessment of $6000 against lot 12 seems at first blush to be excessive, yet we can find no justifiable excuse or reason in the record for this court to interfere with the judgment.

It is argued by appellant that there is no provision of law authorizing a judge, where a jury is waived, to view the premises in this character of cases. Where a jury is waived the judge takes the place of the jury, and it is proper for him to consider all testimony that the jury could properly consider and to view the premises, and the knowledge that he gains from a view of the premises may be considered by him in making his findings and judgment to the same extent as the jury could legally do. Appellant has no cause of complaint that the court did not write his impressions, gained by his view of the premises, in the record, for the reason that no such a request was made after the court viewed the premises or at the time the bill of exceptions was being made up and signed.

It is also contended that the ordinance providing for the improvement is void because it does not contain certain provisions for the improvement of the street, such as the construction of pavement, sidewalks, viaduct and the bridge, which were made by collateral ordinances and contracts. No such questions are open for consideration in this case as they were not raised by appellant in the trial court.

The objection of appellant that the judgment of the court is defective because it does not fix a time for the payment of the award is untenable. The condemnation proceedings in this suit are governed by the provisions of the Local Improvement act. (*City of Chicago* v. *Sullivan Machinery Co.* 269 Ill. 58.) The Eminent Domain act, which does require the court to fix such a time, has no application.

There are no reversible errors shown in the record that were committed by the superior court in this proceeding, and the judgment of that court is affirmed.

*Judgment affirmed.*